UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABDULLAH WRIGHT, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SAN DIEGO, SDPD OFF. BRANDON LOPEZ, <br><br> Defendants. | Case No.:  24cv2089-GPC(BLM) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND** |

Before the Court is Defendants' motion to dismiss the second, third and fourth causes of action pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 6.) Plaintiff filed an opposition and Defendants replied.  (Dkt. Nos. 9, 10.)  The Court finds that the matter is appropriate for decision without oral argument pursuant to Local Civ. R. 7.1(d)(1).  Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss with leave to amend.

## Background

On November 7, 2024, Plaintiff Abdullah Wright ("Plaintiff") filed a 42 U.S.C. § 1983 civil rights complaint against Defendants City of San Diego and San Diego Police Officer B. Lopez ("Officer Lopez") (collectively "Defendants").  (Dkt. No. 1, Compl. ¶¶ 6-8.)

1    At the time of the alleged incident, Plaintiff was a teen-age Black college student
2    attending San Diego State University ("SDSU") with no criminal history, and alleges that
3    on September 24, 2023, around 1:00 p.m., he was driving his two younger brothers in a
4    vehicle, owned by his father, in the College West neighborhood of San Diego.  (*Id.* ¶¶ 25-
5    28, 36-58, 74, 91.)  Plaintiff was driving north on 54th Street and stopped at the four-way
6    stop at the intersection of 54th Street and Collier Avenue, and saw Officer Lopez
7    approach the same intersection from the opposite direction.  (*Id.* ¶¶ 37-39.)  After
8    stopping, Plaintiff continued north on 54th Street as Officer Lopez drove south.  (*Id.* ¶¶
9    40-41.)  Plaintiff then parked his vehicle on top of the hill heading north on 54th Street
10   and told his brothers to walk down the hill while Plaintiff tied his shoelaces.  (*Id.* ¶¶ 43,
11   56-57.)  At this time, Plaintiff alleges that he had a valid driver's license, valid auto
12   insurance, and the vehicle had no Vehicle Code violations.  (*Id.* ¶¶ 44, 45, 48, 50, 52.)  In
13   addition, Plaintiff alleges he did not commit any driving violations.  (*Id.* ¶ 54.)

14   Plaintiff noticed that Officer Lopez drove past him again heading north on 54th
15   Street after making a U-turn, and then Officer Lopez drove past him heading south again
16   on 54th Street, and finally, on his fourth approach, Officer Lopez turned on the
17   emergency lights on his marked San Diego police vehicle.  (*Id.* ¶¶ 58-60.)

18   Officer Lopez exited his vehicle and ordered Plaintiff to come to him.  (*Id.* ¶¶ 66,
19   67.)  Plaintiff immediately complied and walked over to Officer Lopez in the street.  (*Id.*
20   ¶¶ 70, 71.)  When Officer Lopez asked if the vehicle was his, Plaintiff said yes and
21   explained the vehicle is registered in his father's name.  (*Id.* ¶¶ 73, 74.)  Without any
22   reasonable suspicion or probable cause, Officer Lopez informed Plaintiff that he was
23   being detained and placed handcuffs behind Plaintiff's back.  (*Id.* ¶ 75.)  Plaintiff was not
24   free to leave.  (*Id.* ¶ 79.)  Officer Lopez then requested back up and another patrol vehicle
25   with two uniformed officers arrived on the scene with their emergency lights on.  (*Id.* ¶¶
26   81, 82.)  Plaintiff's 16-year-old and 13-year-old brothers were alarmed and concerned by
27   what they saw and came back asking Plaintiff what was happening.  (*Id.* ¶ 83.)  Because
28   Plaintiff worried about his brothers' safety, he advised them to stay calm and gave his 16-

year-old brother his cell phone to call their father.  (*Id.* ¶¶ 84, 85.)  Plaintiff's father, an SDSU Professor ("Professor Wright"), was working nearby in a coffee shop.  (*Id.* ¶ 86.)  When Plaintiff's father was on the phone with Officer Lopez, he explained that he had arrested Plaintiff for an "unreported vehicle theft."  (*Id.* ¶¶ 87, 88.)  Professor Wright corroborated what Plaintiff had said and immediately came to the scene of the arrest.  (*Id.* ¶ 91.)  Plaintiff was eventually released and not charged with any offense.  (*Id.* ¶ 92.)

However, Officer Lopez completed an "arrest report" indicating Plaintiff was arrested for violation of Vehicle Code section 10851 for taking a vehicle without the owner's consent/vehicle theft.  (*Id.* ¶¶ 93, 94.)  On October 4, 2023, Plaintiff requested a copy of the arrest report, and on October 25, 2023, he filed a petition with the San Diego Police Department Records Division and the San Diego District Attorney requesting that they seal and destroy his arrest records pursuant to California Penal Code section 851.8(a).  (*Id.* ¶ 98.)  On October 31, 2023, the San Diego Police Department Records Division denied the request stating since it was only a detention, no certificate of release or sealing can be provided since Plaintiff was never booked in the system.  (*Id.* ¶ 102.)  It further stated that Plaintiff's arrest record will not follow him since it was only a detention and he was released at the scene so there would be no criminal record.  (*Id.*)  Plaintiff is concerned that if he is illegally arrested again, the arresting officer might believe he is a threat having had prior criminal involvement which could lead to an unnecessary escalation of the use of force against him that could place him in danger.  (*Id.* ¶¶ 106, 107.)  Plaintiff seeks damages, the sealing and destruction of the "arrest report" and a statement of exoneration from the San Diego Police Department.

Plaintiff alleges six causes of action: (1) violation of his Fourth/Fourteenth Amendment right against an unlawful seizure under 42 U.S.C. § 1983 against Defendant Officer Lopez; (2) violation of his Fourteenth Amendment right to equal protection under

24cv2089-GPC(BLM)

1  42 U.S.C. § 1983 against Defendant Officer Lopez; (3) 42 U.S.C. § 1983 *Monell*[1] claim

2  for failure to properly train against the City of San Diego; (4) violation of the Bane Act

3  pursuant to California Civil Code section 52.1 against all Defendants; (5) negligence

4  against all Defendants; and (6) false arrest against all Defendants.  (*Id.* ¶¶ 111-58.)  On

5  January 10, 2025, Defendants filed the instant motion to dismiss the second through

6  fourth causes of action which is fully briefed.  (Dkt. Nos. 6, 9, 10.)

**Discussion**

**A.      Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

9          Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to

10  state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6)

11  requires the Court to dismiss claims that fail to establish a cognizable legal theory or do

12  not allege sufficient facts to support a cognizable legal theory.  *Mendiondo v. Centinela*

13  *Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted).  Under Rule

14  8(a)(2) a complaint must contain "a short and plain statement of the claim which entitles

15  the pleader to relief."  Fed. R. Civ. P. 8(a)(2).

16          "To survive a motion to dismiss, a complaint must contain sufficient factual

17  matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft*

18  *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

19  570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

20  that allows the court to draw the reasonable inference that the defendant is liable for the

21  misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action,

22  supported by mere conclusory statements, do not suffice."  *Id.*  "In sum, for a complaint

23  to survive a motion to dismiss, the non-conclusory factual content, and reasonable

24  inferences from that content, must be plausibly suggestive of a claim entitling the

25

26

27  ─────────────

28  [1] *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978).

24cv2089-GPC(BLM)

1  plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009)

2  (quotations omitted).

3       To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed

4  factual allegations, but it must provide allegations that raise a right to relief above the

5  speculative level. *Twombly*, 550 U.S. at 555. While the plausibility standard is not a

6  probability test, it does require more than a mere possibility the defendant acted

7  unlawfully. *Id.* at 556. "When evaluating a Rule 12(b)(6) motion, the Court must accept

8  all material allegations in the complaint as true, and construe them in the light most

9  favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,

10  710 F.3d 946, 956 (9th Cir. 2013) (citation omitted).

11  **B.    Second Cause of Action – 42 U.S.C. § 1983 - Equal Protection Clause**

12       Defendants maintain that the equal protection claim should be dismissed because

13  Plaintiff has failed to plead any facts that Officer Lopez acted with discriminatory intent

14  and the comparative class of "white individuals in San Diego" is extremely broad and

15  undefined. (Dkt. No. 6-1 at 4-6.[2]) Plaintiff argues he has sufficiently alleged Officer

16  Lopez' intent to discriminate based on race because there was no basis to stop or arrest

17  him and relies on statistical evidence showing Black drivers are disproportionately

18  stopped in comparison to White drivers by San Diego Police officers. (Dkt. No. 9 at 10.)

19       The second cause of action complains that Officer Lopez violated Plaintiff's right

20  to equal protection of the laws when he was subject to an unlawful seizure due to his

21  race. (Dkt. No. 1, Compl. ¶¶ 124-29.) He claims that he is a member of a suspect class

22  and was treated differently than "white individuals in San Diego." (*Id.* ¶ 129.)

23       The Equal Protection Clause of the Fourteenth Amendment provides, in relevant

24  part, that: "[n]o state shall . . . deny to any person within its jurisdiction the equal

25  protection of the laws." U.S. Const., amend. XIV. To establish an equal protection

26

27  ───────────────

28  [2] Page numbers are based on the CM/ECF pagination.

24cv2089-GPC(BLM)

1   violation, a "plaintiff[ ] must show that actions of the defendants had a discriminatory

2   impact, and that defendants acted with an intent or purpose to discriminate based upon

3   plaintiff['s] membership in a protected class." *Comm. Concerning Cmty. Improvement v.*

4   *City of Modesto,* 583 F.3d 690, 702-03 (9th Cir. 2009) ("*CCCI*"); *see Thornton v. City of*

5   *St. Helens*, 425 F.3d 1158, 1166-67 (9th Cir. 2005) (same).  A plaintiff does not need to

6   show that the "challenged action rested solely on racial discriminatory purposes" but

7   must demonstrate that the discriminatory purpose was a "motivating factor" in the

8   challenged action.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252,

9   265-66 (1977).  Determining discriminatory intent "demands a sensitive inquiry into such

10  circumstantial and direct evidence of intent as may be available."  *Id.* at 266.  "In

11  determining whether a discriminatory intent or purpose exists, [courts] may consider

12  direct evidence of discrimination, statistical evidence showing a discriminatory impact, or

13  other factors that could reveal a discriminatory purpose, like the historical background of

14  the policy." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) (citing

15  *CCCI*, 583 F.3d at 703).  Statistics along with other evidence may be sufficient to

16  demonstrate discriminatory intent.  *Chavez v. Ill. State Police*, 251 F.3d 612, 647 (7th

17  Cir. 2001).

18       Here, Plaintiff alleges that Officer Lopez detained and arrested him due to his race,

19  a Black male.  (Dkt. No. 1, Compl. ¶¶ 26, 65, 69, 76, 78, 126.)  According to the

20  complaint, Plaintiff alleges he complied with all laws while driving his vehicle, had no

21  criminal history, had a valid driver's license, valid auto insurance, and valid registration

22  on his vehicle.  (*Id.* ¶¶ 27, 39-40, 44, 45, 46, 54.)  Further, the vehicle did not have tinted

23  windows, was not missing license plates, and had no violations of the Vehicle Code.  (*Id.*

24  ¶¶ 48, 50, 52.)  As such, Plaintiff claims that Officer Lopez had no reasonable suspicion

25  or probable cause to detain and to arrest and place Plaintiff in handcuffs.  (*Id.* ¶ 77.)  The

26  Court concludes that Plaintiff has alleged facts to permit an inference that he was stopped

27  by Officer Lopez due to his race.  *See Waters v. Howard Sommers Towing, Inc*., No. 10–

28  5296, 2011 WL 2601835, at *6 (C.D. Cal. June 30, 2011) (denying motion to dismiss

1    equal protection claim where officer claimed broken taillight was basis for traffic stop but

2    the plaintiff alleged taillight was not broken and there was no reason other than racial

3    profiling to justify stop).

4           Further, Plaintiff relies on statistical evidence to show discriminatory intent by San

5    Diego Police officers because they "disproportionately conduct vehicle and pedestrian

6    stops on Black individuals compared to white individuals given their relative

7    representation in the population."  (Dkt. No. 9 at 11.)  In support, the complaint relies on

8    data from the Racial and Identity Act ("RIPA"), the Police Scorecard and the Center for

9    Policing Equity.  (Dkt. No. 1, Compl. ¶¶ 17-24.)  First, the complaint alleges RIPA

10   provides data about vehicle and pedestrian stops in California but provides no data

11   concerning the City of San Diego.  (*Id.* ¶ 18.)  Therefore, RIPA does not support

12   Plaintiff's claim that San Diego Police Officers disproportionally stop Black drivers in

13   traffic stops compared with White drivers.

14          Next, the Police Scorecard reports on the period from July 2018 through June 2019

15   showing that the San Diego Police stopped Black people at the highest rates than any

16   other group and were stopped a rate of 219% higher per population than White people.

17   (*Id.* ¶ 21.)  For example, during this period, the San Diego police made 35,038 stops of

18   Black people during a 12-month period where the total number of black residents was

19   88,774 which demonstrate an "extreme level of policing impacting black San Diego

20   residents."  (*Id.* ¶ 22.)  Moreover, during this period, the majority of stops were initiated

21   by officers which suggests racial disparities in police stops are due to police decision-

22   making rather than the product of officers responding to calls from civilians.  (*Id.* ¶ 23.)

23   Finally, the Center for Policing Equity found that Black San Diegans were stopped 4.2

24   times as often as White San Diegans from 2018 to 2020 after adjusting for crime rates,

25   neighborhood demographics, and poverty rates.  (*Id.* ¶ 24.)  The latter two studies provide

26   sufficient allegations that San Diego Police officers disproportionately stop Black drivers

27   compared to White drivers in San Diego.

28

1    Therefore, the Court concludes that the combination of Plaintiff's allegations

2 concerning his alleged illegal traffic stop, and the data from the Police Scorecard and the

3 Center for Policing Equity allege a plausible allegation that Officer Lopez acted with

4 discriminatory intent against Plaintiff when he was detained and arrested.[3]

5    Defendants also argue that the comparative class of "white individuals in San

6 Diego" is undefined and broad because it does not specify how white individuals are

7 indistinguishable from Plaintiff.  (Dkt. No. 6-1 at 5.)  Plaintiff explains he is comparing

8 black drivers and pedestrians within San Diego and white drivers and pedestrians in San

9 Diego.  (Dkt. No. 9 at 15.)  In reply, Defendants continue to argue that the comparison

10 between white drivers and pedestrian and black drivers and pedestrians is still too broad

11 because it fails to account for relevant factors that could affect an officer's treatment of

12 them.  (Dkt. No. 10 at 6-7.)

13    "Once the plaintiff establishes governmental classification, it is necessary to

14 identify a 'similarly situated' class against which the plaintiff's class can be compared."

15 *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995).  People are 'similarly

16 situated' when their circumstances are practically "indistinguishable", *Ross v. Moffitt*,

17 417 U.S. 600, 609 (1974), or "in all relevant respects alike[.]"  *Nordlinger v. Hahn*, 505

18 U.S. 1, 10 (1992).  "The goal of identifying a similarly situated class . . . is to isolate the

19 factor allegedly subject to impermissible discrimination.  The similarly situated group is

20 the control group."  *Freeman*, 68 F.3d at 1187 (quoting *United States v. Aguilar*, 883

21 F.2d 662, 706 (9th Cir. 1989), *cert. denied*, 498 U.S. 1046 (1991)).  As recognized by the

22

23

24 [3] Without providing relevant legal authority, Defendants challenge the reports as not covering the period when Plaintiff was detained because the reports addressed statistics from 2018 to 2020 and the incident

25 at issue occurred in September 2023.  (Dkt. No. 6-1 at 8; Dkt. No. 10 at 3.)  In response, Plaintiff argues he provided the most up-to-date available racial profiling data because there is a delay between when the

26 data is reported by law enforcement agencies and when it is made publicly available.  (Dkt. No. 9 at 21.) Plaintiff has provided the most recent publicly available data regarding police stops in San Diego.  At

27 the motion to dismiss stage, without having conducted discovery or retained experts, the Court concludes that the statistics from 2018 to 2020 create a plausible inference of discriminatory intent to

28 support an equal protection claim as well as a *Monell* failure to train cause of action.

24cv2089-GPC(BLM)

1    Seventh Circuit, there is not "magic formula for determining whether someone is

2    similarly situated.  This is due, seemingly, to the essentially factual nature of the inquiry.

3    Different factors will be relevant for different types of inquiries—it would be imprudent

4    to turn a common-sense inquiry into a complicated legal one.  In determining who is

5    similarly situated, we have also been careful not to define the requirement too narrowly."

6    *Chavez*, 251 F.3d at 636.

7        Here, though the complaint alleges the comparative class to be "white individuals

8    in San Diego", (Dkt. No. 1, Compl. ¶ 129), in opposition Plaintiff clarified that the

9    comparative class is White drivers and pedestrians in San Diego subject to traffic stops

10   by the police.  The comparative class of White drivers is even supported by the statistical

11   data relied on by Plaintiff.

12       Defendants' summary argument that the comparative class of White drivers and

13   pedestrians in traffic stops is still too broad and undefined is not supported by any

14   relevant caselaw.  In fact, similarly situated White drivers have been used as a

15   comparator in traffic stop cases.  *See e.g., Chavez*, 251 F.3d at 641 (issue was "whether

16   [state police troopers] stop, detain, and search African–American and Hispanic motorists

17   when the troopers do not stop, detain, and search similarly situated white motorists.");

18   *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1171 (C.D. Cal. 2022) (denying

19   summary judgment on equal protection given statistical evidence that officers "almost

20   exclusively targeted Black and Latino motorists for traffic stops, and very rarely, if ever,

21   stopped similarly situated White motorists."); *Orellana v. Cnty. of Los Angeles*, CASE

22   NO. CV 12-01944 MMM (CWx), 2013 WL 12122692, at *15 (C.D. Cal. Apr. 29, 2013)

23   (granting summary judgment on equal protection claim because the plaintiff "adduce[d]

24   no statistical evidence regarding the number of Hispanic drivers stopped versus the

25   number of non-Hispanic drivers stopped by [the defendant officer].").

26       Because the complaint alleges the comparative class to be "white individuals in

27   San Diego", which is not what Plaintiff intended, the Court GRANTS Defendant's

28   motion to dismiss the second cause of action with leave to amend the complaint to correct

24cv2089-GPC(BLM)

1    the comparator class; however, the Court DENIES Defendant's motion on the other

2    ground raised.

3    **C.    Third Cause of Action –42 U.S.C. § 1983 -** *Monell* **Failure to Properly Train**

4    Defendants argue that the failure to properly train claim against the City of San

5    Diego should be dismissed because Plaintiff has failed to provide any facts to support his

6    conclusory statements about its inadequate training program.  (Dkt. No. 6-1 at 6-10.)

7    Plaintiff contends that the City of San Diego knew or should have known that its officers

8    "use race, in particular being Black, as a factor contributing to warrantless stops and

9    seizures" exhibiting a deliberate indifference to the substantial risk that its training

10    policies are inadequate to prevent violations by its officers.  (Dkt. No. 9 at 17-18, 19-20.)

11    The third cause of action alleges a failure to train claim against the City of San

12    Diego.  (Dkt. No. 1, Compl. ¶¶ 130-40.)

13    Cities, counties and other local government entities are subject to claims under 42

14    U.S.C. § 1983.  *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658

15    (1978).  While municipalities, their agencies and their supervisory personnel cannot be

16    held liable under § 1983 on any theory of respondeat superior or vicarious liability, they

17    can, however, be held liable for deprivations of constitutional rights resulting from their

18    formal policies or customs.  *Id.* at 691-93.  Liability only attaches where the municipality

19    itself causes the constitutional violation through "execution of a government's policy or

20    custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

21    said to represent official policy."  *Id.* at 694.

22    "In limited circumstances, a local government's decision not to train certain

23    employees about their legal duty to avoid violating citizens' rights may rise to the level of

24    an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S.

25    51, 61 (2011).  Failure to train may serve as a basis for § 1983 municipal liability only

26    "where failure to train amounts to deliberate indifference to rights of persons with whom

27    the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

28    Deliberate indifference requires proof that the municipal entity "disregarded a known or

10

1   obvious consequence" that a particular omission in its training program would cause city

2   employees to violate citizens' constitutional rights.  *See Bd. of Cnty. Com'rs of Bryan*

3   *Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (deliberate indifference is "a stringent

4   standard of fault, requiring proof that a [municipality] disregarded a known or obvious

5   consequence of [its] action."); *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th

6   Cir. 2014) (plaintiff must allege the city entity "disregarded the known or obvious

7   consequence that a particular omission in their training program would cause [municipal]

8   employees to violate citizens' constitutional rights") (quoting *Connick*, 563 U.S. at 1360).

9        "Thus, when [the municipal entity is] on actual or constructive notice that a

10  particular omission in their training program causes city employees to violate citizens'

11  constitutional rights, the city may be deemed deliberately indifferent if the policymakers

12  choose to retain that program." *Connick*, 563 U.S. at 61 (citing *Brown*, 520 U.S. at 407).

13  In other words, a "[f]ailure to train may amount to a policy of 'deliberate indifference,' if

14  the need to train was obvious and the failure to do so made a violation of constitutional

15  rights likely." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (first

16  alteration in original).

17       "To allege a failure to train, a plaintiff must include sufficient facts to support a

18  reasonable inference (1) of a constitutional violation; (2) of a municipal training policy

19  that amounts to a deliberate indifference to constitutional rights; and (3) that the

20  constitutional injury would not have resulted if the municipality properly trained their

21  employees." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153-54 (9th Cir. 2021)

22  (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007)).   A plaintiff

23  alleging deliberate indifference can survive a Rule 12(b)(6) challenge if he alleges the

24  municipality has engaged in a pattern of prior, similar violations of federally protected

25  rights of which it had actual or constructive notice.  *See Connick*, 563 U.S. at 62 ("A

26  pattern of similar constitutional violations by untrained employees is 'ordinarily

27  necessary' to demonstrate deliberate indifference . . . ."); *Starr v. Baca*, 652 F.3d 1202,

28  1216-17 (9th Cir. 2011) (reversing dismissal where plaintiff "specifically allege[s]

11

numerous incidents" of prior, similar incidents of excessive force and the defendant was provided notice of all these incidents); *Bagos v. Vallejo*, No. 2:20-cv-00185-KJM-AC, 2020 WL 6043949, at \*5-6 (E.D. Cal. Oct. 13, 2020) ("[p]rior incidents involving lawsuits alone, even those which do not result in a finding or admission of wrongdoing, can be sufficient for *Monell* liability purposes in the face of a motion to dismiss."); *Villa v. Cnty. of San Diego,* Case No.: 20-CV-537-CAB-NLS, 2020 WL 5535384, at \*3-4 (S.D. Cal. Sept. 15, 2020) (denying motion to dismiss *Monell* claim of policy and custom and failure to train claim as the plaintiff referenced federal investigations, citizen complaints and lawsuits against the County that include similar allegations of misconduct).

In this case, Plaintiff alleges that the City of San Diego violated his Fourth Amendment right to be free from an unlawful seizure and arrest and his right to equal protection under the Fourteenth Amendment.  (Dkt. No. 1, Compl. ¶¶ 135-36.)  Plaintiff also asserts that the City of San Diego knew and has known that Black individuals are disproportionately stopped by San Diego Police officers compared to their proportion in the community.  (*Id.* ¶¶ 131, 132.)  Further, he complains the City of San Diego knew or should have known that its officers use race as a factor contributing to warrantless stops and seizures, thereby causing Black persons to be deprived of their constitutional rights to be free from illegal searches and seizures and the right to equal protection under the law. (*Id.* ¶¶ 133, 134.)  In support of these allegations, the complaint relies on statistical data known to the City of San Diego that its Officers disproportionately stop Black people than other similarly situated White drivers.  (*Id.* ¶¶ 17-20, 23 n.1.)  Finally, Plaintiff claims that despite this knowledge, the City of San Diego's failure to train its officers not to use race as a factor in stopping individuals and that consideration of an individual's race does not constitute reasonable suspicion to stop or probable cause to arrest deprived him of his Fourth Amendment right and his right to equal protection under the law.  (*Id.* ¶¶ 135, 136.)  As such, the City of San Diego was deliberately indifferent to the substantial risk its policies were inadequate to prevent violations of law by its officers.

24cv2089-GPC(BLM)

1  (*Id.* ¶ 139.)  This failure to prevent violations of law by its officers played a substantial

2  part in bringing about or actually causing the injury or damage to Plaintiff.  (*Id.* ¶ 140.)

3       The Police Scorecard reveals that from July 2018 to June 2019, the San Diego

4  Police stopped Black people at the highest rates than any other group, and the Center for

5  Policing Equity reports that Black San Diegans are stopped 4.2 times as often as white

6  San Diegans from 2018 to 2020.  (*Id.* ¶¶ 21-24.)  These statistical data and the City of

7  San Diego's knowledge of racial disparities in police stops provide sufficient facts to

8  allege the City's deliberate indifference.  Therefore, the Court DENIES Defendants'

9  motion to dismiss the third cause of action under *Monell*'s failure to train.  *See McKinnie*

10  *v. City of San Diego*, No. 24-cv-827-JLS-SBC, 2024 WL 4126062 at *4 (S.D. Cal. Sep.

11  9, 2024) (holding that multiple studies "detailing alleged discriminatory policing by

12  SDPD" and biased policing towards communities of color meets the standard for

13  deliberate indifference); *Ames v. Cnty. of San Bernardino*, No. CV 18-1362-SJO (FFMx),

14  2019 WL 4148179, at *5 (C.D. Cal. June 7, 2019) (denying the County's motion to

15  dismiss a failure to train claim based on "[p]revious experiences with inmate deaths,

16  coupled with the previous [2016 class action] consent decree, support a finding that the

17  County was aware of the constitutional flaws in its policies, yet failed to act on this

18  knowledge.").

19  **D.     Fourth Cause of Action – Bane Act, Cal. Civ. Code section 52.1**

20       Defendants move to dismiss the Bane Act claim because Plaintiff failed to allege

21  that Officer Lopez specifically intended to violate his constitutional rights or that he acted

22  with reckless disregard.  (Dkt. No. 6-1 at 9.)  Plaintiff disagrees. (Dkt. No. 9 at 23-25.)

23       The fourth cause of action alleges a violation of California's Bane Act for an

24  unlawful arrest and violation of the equal protection of the laws.  (Dkt. No. 1, Compl. ¶¶

25  141-45.)

26       The Bane Act provides a private cause of action against anyone who "interferes by

27  threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or

28  coercion, with the exercise or enjoyment by an individual or individuals of rights secured

24cv2089-GPC(BLM)

1    by the Constitution or laws of the United States, or of the rights secured by the

2    Constitution or laws of California."  Cal. Civil Code § 52.1(b) & (c); *Reese v. Cnty. of*

3    *Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (the Bane Act "protects individuals

4    from conduct aimed at interfering with rights that are secured by federal or state law,

5    where the interference is carried out 'by threats, intimidation or coercion.'").

6         "The elements of a Bane Act claim are essentially identical to the elements of a §

7    1983 claim, with the added requirement that the government official had a 'specific

8    intent to violate' a constitutional right."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th

9    Cir. 2022) (quoting *Reese*, 888 F.3d at 1043).  "The specific intent inquiry for a Bane Act

10   claim is focused on two questions: First, '[i]s the right at issue clearly delineated and

11   plainly applicable under the circumstances of the case,' and second, '[d]id the defendant

12   commit the act in question with the particular purpose of depriving the citizen victim of

13   his enjoyment of the interests protected by that right?'"  *Sandoval v. Cnty. of Sonoma*,

14   912 F.3d 509, 520 (9th Cir. 2018) (quoting *Cornell v. City & Cnty. of San Francisco*, 17

15   Cal. App. 5th 766, 803 (2017)).  Facts demonstrating "reckless disregard" meet the

16   burden of specific intent because "a reckless disregard for a person's constitutional rights

17   is evidence of a specific intent to deprive that person of those rights."  *Reese*, 888 F.3d at

18   1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)).

19        Here, the complaint has plausibly alleged a violation of Plaintiff's Fourth and

20   Fourteenth Amendment rights against an unlawful seizure/unlawful arrest based on the

21   fact that Officer Lopez did not have a warrant, and did not have reasonable suspicion or

22   probable cause to arrest Plaintiff for vehicle theft.  (Dkt. No. 1, Compl. ¶¶ 94, 113-115.)

23   As discussed above, with the exception of failing to properly allege the comparator class

24   which Plaintiff may correct with an amended complaint, Plaintiff has also alleged an

25   equal protection claim.  On the second inquiry, Plaintiff has alleged that Officer Lopez

26   committed the unlawful seizure and arrest and violated his equal protection right in

27   reckless disregard to deprive him of his enjoyment of the interests protected by the Fourth

28   and Fourteenth Amendments.  (*Id.* ¶ 142.)  Therefore, the complaint has sufficiently

24cv2089-GPC(BLM)

1  alleged that Officer Lopez acted with specific intent to deprive Plaintiff of his

2  constitutional rights.  *See Smith v. City of Marina*, 709 F. Supp. 3d 926, 939 (N.D. Cal.

3  2024) ("At the motion to dismiss stage, . . . allegations of conduct that violates

4  constitutional rights coupled with allegations that the conduct was done with reckless

5  disregard for a party's rights can be sufficient to establish specific intent.").  Accordingly,

6  the Court DENIES Defendant's motion to dismiss the Bane Act claim.

7  **E.     Leave to Amend**

8          To the extent the Court dismisses any causes of action, Plaintiff seeks leave to

9  amend to cure the pleading's deficiencies.  (*See* Dkt. No. 9 at 9.)  When the Court

10  dismisses a complaint pursuant to Rule 12(b)(6), it should grant leave to amend unless

11  the pleading cannot be cured by new factual allegations.  *See Chubb*, 710 F.3d at 956.

12  Thus, the Court GRANTS Plaintiff's request for leave to amend.

13                                    **Conclusion**

14          Based on the above, the Court GRANTS in part and DENIES in part Defendants'

15  motion to dismiss.  Plaintiff is granted leave to file an amended complaint to correct the

16  deficiency noted above within seven (7) days of the filing of this order.  The hearing set

17  on May 9, 2024 shall be **vacated**.

18          IT IS SO ORDERED.

19  Dated:  April 28, 2025

20                                                          Hon. Gonzalo P. Curiel
                                                            United States District Judge

21

22

23

24

25

26

27

28

15

24cv2089-GPC(BLM)